# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Malik Laughlin, et al., | Case No. 19-cv-2547 (ECT/TNL) |
| Plaintiffs, | |
| v. | **REPORT & RECOMMENDATION** |
| James Stuart, et al., | |
| Defendants. | |

---

Malik Laughlin, OID #259995, MCF-Rush City, 7600 525th Street, Rush City, MN 55069; and Emily Claire Hari, Livingston County Jail, 844 West Lincoln, Pontiac, IL 61764 (pro se Plaintiffs);

Robert I. Yount, Assistant Anoka County Attorney, Government Center, 2100 Third Avenue, Suite 720, Anoka, MN 55303 (for Defendants James Stuart, Jonathon Evans, Lt. Sheila Larson, Sgt. Carrie Wood, and Jesse Rasmussen).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on County Defendants' Motion for Summary Judgment (ECF No. 357). This motion has been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. (ECF No. 98.) Based on all the files, records, and proceedings herein, and for the reasons set forth below, the Court recommends that County Defendants' motion be **GRANTED** and that this matter be dismissed with prejudice.

1

# I. PROCEDURAL HISTORY

Plaintiffs Malik Laughlin, Kenneth Lewis, and Emily Hari[1] brought this action pursuant to 42 U.S.C. § 1983 on August 22, 2019. (ECF No. 1.) Their original complaint arose from events that occurred while all three were inmates at the Anoka County Jail ("ACJ"). (*Id.*) This included allegations that jail employees (1) provided inadequate dietary nutrition in violation of the Fifth and Fourteenth Amendments; (2) inhibited each Plaintiffs' ability to communicate with their attorneys and review legal materials, and that jail employees reviewed materials subject to attorney-client privilege in violation of their Fifth, Sixth, and Fourteenth Amendment rights; (3) performed "sexually abusive patdowns" in violation of their Fifth and Eighth Amendment rights; (4) failed to provide adequate access to discovery in their criminal cases in violation of their Fifth, Sixth, and Fourteenth Amendment rights; (5) failed to provide adequate access to the jail's law library in violation of their Fifth and Fourteenth Amendment rights; and (6) violated their Fifth and Fourteenth amendment rights through disciplinary segregation. (*Id.*)

Plaintiffs filed their first motion to amend their complaint in May of 2020. (ECF No. 64.) Plaintiffs proposed adding extensive claims specific to Hari. (*Id.*) These claims related to allegations that employees of multiple law enforcement agencies and correctional facilities collected and reviewed Hari's privileged telephone calls; correctional officers at the Sherburne County Jail monitored Hari's use of a computer to view discovery and correspond with her attorney; unidentified Marshals in Illinois seized

---

[1] Emily Hari was formerly known as Michael Hari. (*See* ECF No. 408.)

Hari's legal mail and disclosed information in it; mail that Hari sent from the Sherburne County Jail was opened, disclosed, and, in some cases, altered and delayed in delivery; and certain correctional officers searched Hari's cell and read her legal materials.  (ECF No. 64-1 at 17-26.)

The Court granted in part and denied in part Plaintiffs' motion.  Plaintiffs were granted leave to file an amended complaint adding certain claims and supporting allegations under 42 U.S.C. § 1983: namely, violations of Laughlin's rights under the First Amendment as to Sergeant Carrie Wood and Deputy Jonathan Evans; and violations of Lewis's rights under the First and Sixth Amendments as to Sheriff James Stuart and Detective Tessa Villegas.  (ECF No. 81.) The order denied the motion to amend with regard to Hari's newly outlined claims.[2]  (*Id.*)  Plaintiffs filed their Amended Civil Rights Complaint on June 23, 2020.  (ECF No. 85.)

Plaintiffs again moved to amend their complaint in September of 2020.  (ECF No. 176.)  Citing knowledge gained through the discovery process, Plaintiffs sought to amend the First Amended Complaint by: (1) removing Plaintiffs' claims based on sexually abusive pat-down searches, punitive diet in segregation, and punitive disciplinary segregation; (2) adding various pieces of factual evidence obtained in discovery in support of their claims, "primarily for the lawyer client violations of mail and telephone privilege and privacy" claims; and (3) Hari sought to add a claim against Deputy Jesse

---

[2] Hari subsequently brought these claims in a separate suit in June 2020.  *See Hari v. Smith, et al.*, No. 20-cv-1455 (ECT/TNL) (D. Minn.).

Rasmussen for seizing a piece of her legal mail in June of 2019.  (*Id.* at 2; *see also* ECF No. 178.)

The Court again granted in part and denied in part Plaintiffs' motion.  (ECF No. 303.)  Plaintiffs were allowed to file a Second Amended Complaint to add Hari's claim as to Deputy Rasmussen, remove claims, and organize the complaint.  (*Id.* at 13.)  The order denied Plaintiffs' requests for amendment in all other respects.  (*Id.*)  Plaintiffs filed their Second Amended Complaint in March of 2021.  (ECF No. 311.)

Defendant Tessa Villegas filed a motion to dismiss on April 5, 2021.  (ECF No. 321.)  The remaining Defendants (hereinafter collectively "County Defendants"), all employees of Anoka County during the relevant time period,  filed a motion for summary judgment on June 14, 2021.  (ECF No. 357.)  Lewis has since settled his claims with County Defendants  (ECF No. 411) and Tessa Villegas (ECF No. 413).  Lewis's claims have been dismissed with prejudice.  (ECF No. 418.)

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Under Rule 56(a), courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *accord Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Gannon Int'l*, 684 F.3d at 792.

This is true of pro se litigants as well. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001) ("Like any other civil litigant, [the pro se plaintiff] was required to respond to defendants' motions with specific factual support for his claims to avoid summary judgment."); *see also, e.g.*, *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) (per curiam) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit"); *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984) (per curiam) ("Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law."). "To establish a genuine issue of material fact, . . . [the non-moving party] may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in his favor." *Turner v. Mull*, 784 F.3d 485, 489 (8th Cir. 2015) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted); *see, e.g.*, *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011).

### B. Section 1983

Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Thus, "Section 1983 creates a species of tort liability for the deprivation of any rights, privileges, or immunities secured by the Constitution." *Manuel v. City of Joliet*, 137 S. Ct. 911, 916 (2017) (quotations and citations omitted). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### C.  Facts

#### 1.  Plaintiffs' Presence at the ACJ

##### a.  Bookings

 Plaintiffs' Second Amended Complaint details claims made while both were inmates at the ACJ in 2019. (*See* Sec. Am. Compl. ¶ 5.)

Hari was arrested in March 2018 after the filing of a complaint in this district related to the bombing of the Dar al-Farooq Islamic Center and Mosque in Bloomington, Minnesota. *See United States v. Hari et al.*, 18-cr-150 (DWF/HB) (D. Minn.) [hereinafter *United States v. Hari*], ECF No. 1; *see also Hari v. Stuart*, No. 19-cv-1330 (ECT/TNL),

2020 WL 7249816, at *2 (D. Minn. Aug. 21, 2020) [hereinafter *Hari I*], *report and recommendation adopted*, 2020 WL 6391305 (D. Minn. Nov. 2, 2020).  Hari was later indicted on several charges related to that bombing.  *Hari I*, 2020 WL 7249816, at *2.  She was transported from Illinois to the Sherburne County Jail in February 2019 by the United States Marshals Service.  *Id.*  During this transport, she attempted to escape.  *Id.*  She was transported to the ACJ in April 2019.  *Id.*

Laughlin was booked into the ACJ in June 2019 pending state charges in multiple cases filed in the District Court for Anoka County.  *See State of Minnesota v. Malik Laughlin,* case number 02-CR-18-2752; *State of Minnesota v. Malik Laughlin*, case number 02-CR-18-2794; *State of Minnesota v. Malik Laughlin*, case number 02-CR-18-3408, *available at MCRO*, https://publicaccess.courts.state.mn.us/CaseSearch (last visited Jan. 19, 2022).

### b.  Plaintiffs' Security Classifications While at the ACJ

### i.  General Classification Information

Inmates arriving at the ACJ are given an initial security classification based on "the severity of the inmate's charges, offense history, and escape history."  *Hari I*, 2020 WL 7249816, at *2.  Inmates are classified as general population, minimum security, or special management.  (ECF No. 362-1 at 1.[3])

ACJ staff use these security classifications to determine what unit male inmates will be housed in.[4]  (*Id.* at 4-5; *see also* ECF No. 362-4.)  During the relevant time period, Unit

---

[3] The Court cites to all exhibits filed on behalf of all parties by their ECF pagination.
[4] Hari identified as male while housed in the ACJ.

1 housed minimum security inmates; Unit 2 housed medium custody and general population inmates; Unit 4 housed inmates in disciplinary lockdown and administrative segregation; and Unit 5 was "used primarily" to house inmates in maximum custody. (ECF No. 362-4 ¶ 2.) Unit 6 typically housed medium custody and general population inmates; from April 2019 to May 2019, however, Unit 6 was used to house maximum custody inmates due to construction in the jail. (*Id.*)

Unless they are initially assigned to maximum custody, inmates are set up for a classification interview and review after they have been in custody for seven days. (*Id.* ¶ 5.) Inmates not initially assigned to maximum custody then receive classification reviews after 14 days, and every 30 days thereafter. (*Id.*; *see also* 362-1 at 3.)

An inmate's classification can change while they are in custody. The ACJ assigns inmates with the status of disciplinary segregation "after a disciplinary hearing in which an inmate was found to be in violation of a Jail rule or state or federal law. This status results in separating the inmate from the rest of the inmate population to serve the consequence imposed." (ECF No. 363-3 at 1.) According to the Anoka County Sheriff's Inmate Discipline Policy, "Inmates who are accused of a major rule violation may be moved to administrative segregation housing for prehearing detention, with the Duty Sergeant's approval, if there is a threat to safety or security. Inmates placed in prehearing detention are subject to the property and privilege restrictions commensurate with segregated confinement." (ECF No. 362-2 at 4; *see also* 362-3 at 2 ("[I]nmates in disciplinary segregation . . . or special management inmates who are disciplined for one or more rule violations, may be subject to loss of privileges.").) This loss of privileges includes

restrictions depending on the inmate's particular actions. (*See* ECF No. 362-3 at 2-5.) In addition, inmates in disciplinary lockdown "are subject to routine shakedowns of their cells." (ECF No. 360 ¶ 5.)

### ii. Laughlin

When Laughlin was booked into the ACJ on June 5, 2019, he was originally assigned to Unit 5. (ECF No. 363-2 at 1.) On June 8, 2019, he was moved to Unit 4 on disciplinary segregation. (*Id.*) This transfer was prompted by Laughlin urinating on the floor, spitting on two Anoka County Deputy Sheriffs, and hitting one of those Deputy Sheriffs in the face, for which Laughlin was charged in Anoka County District Court. *See* Compl., *State of Minnesota v. Malik Steven Laughlin*, case number 02-CR-19-3820, *available at MCRO*, https://publicaccess.courts.state.mn.us/CaseSearch (last visited Jan. 19, 2022). Laughlin remained in Unit 4 until his release from the ACJ on August 20, 2019. (*See* ECF No. 363-2 at 1-3; ECF No. 363-3 at 1-2.)

### iii. Hari

This Court has previously discussed Hari's classification status and housing assignments in the ACJ at length. *See Hari I*, 2020 WL 7249816, at *3-4. It incorporates those factual findings herein.

Of relevant note, Hari was originally classified as a maximum custody inmate upon her arrival at the ACJ based on her pending criminal charges, past conviction for child abduction, and attempted escape from a United States Marshal Service transport van. *Id.*

9

at \*3.  She was assigned to Unit 6.  *Id.*  On May 1, 2019, Deputy Michael Mingo[5] conducted

Hari's first classification review and determined that Hari would retain maximum custody

status because she remained an escape risk.  *Id.* at \*3 n.1.  Hari was transferred to a cell in

Unit 5 on May 15, 2019.  (ECF No. 362-18 at 2.)

Hari remained in maximum custody throughout most of May 2019.  *See Hari I*,

2020 WL 7249816, at \*3.  This changed on May 26, 2019, when ACJ deputies conducted

a shakedown of Hari's cell.  *Id.*  ACJ officials discovered that an outlet in Hari's cell was

detached from the wall and wires were removed from the back.  (ECF No. 362-7 at 1.)

Deputies also found a loose screw behind the outlet.  (*Id.*; *see also* ECF No. 375 at 29.)

Hari was placed on pre-hearing lockdown, charged with violations of jail regulations, and

later placed in Unit 4 disciplinary segregation.  (ECF No. 362-18 at 3; *see also* ECF No.

362-8 at 1-3 (summarizing Hari's classification on administrative segregation until August

2019).)  She remained in administrative segregation through the filing of this lawsuit and

her transfer to the Sherburne County Jail.  (*See* ECF No. 362-8 at 3.)

### c. Plaintiffs' Transfer from the ACJ

Plaintiffs were transferred out of the ACJ in August 2019.  Laughlin was released

on August 20, 2019, pending transport to serve time on a prison sentence.  (*See* ECF No.

363-2 at 3.)

Hari was transferred out of the ACJ to Sherburne County Jail the following day.

(*See* ECF No. 362-19 at 5.)  As this Court memorialized in *Hari I*:

> At some point beginning in June 2019 and continuing over the

---

[5] Deputy Mingo is not party to this suit.

next month, Anoka County Jail staff noticed that inmates located in the same area as Hari began to submit coordinated grievances and kites for issues and conduct that they had previously not grieved.  Hari also submitted several additional grievances during this time.  Staff believed that the increase in grievances was the result of Hari's influence and found that the time it took to respond to those grievances was placing a strain on jail resources, which took time and attention away from other Jail functions.

In late July 2019, the Anoka County Jail requested that Hari be transferred.  Staff explained that Hari's behavior issues [had] become a strain on [their] resources; that [she] was taking one of only two spots in the jail's medical unit; that [she] was considered an escape risk as the result of [her] past conduct; that [she] required two-staff escorts and could only attend recreation time when alone; and that [she] took apart an electrical outlet in [her] cell.  A few weeks later, Hari was transferred to the Sherburne County Jail, where [she] was placed in "MAX AD SEG STATUS."

2020 WL 7249816, at *4 (internal quotation marks and citations omitted).

### 2. ACJ Policies

Inmates are notified of their rights and various ACJ policies upon booking.  (*See* ECF No. 362-11.)  A variety of the ACJ's policies are relevant to the motion currently before the Court.

### a. Mail Policy

The Anoka County Sheriff's Office has a written policy that governs "the receipt, rejection, inspection, and sending of inmate mail."  (ECF No. 362-12 at 1.)  Under this policy, inmates are allowed to "correspond confidentially with courts, legal counsel, officials with [the Anoka County Sheriff's Office], elected officials or officers of the court."  (*Id.* at 2.)  General incoming mail that is not confidential is opened and inspected,

11

and may be read "as frequently as deemed necessary to maintain security or monitor a particular problem." (*Id.*) General outgoing mail that is not confidential may not be sealed by an inmate and may be read in certain instances. (*Id.* at 3-4.) The ACJ Commander designates certain staff to read incoming and outgoing non-confidential mail. (*Id.* at 4.)

Confidential mail, including legal mail, is treated differently. ACJ staff "may inspect outgoing confidential correspondence for contraband before it is sealed, provided the inspection is completed in the presence of the inmate." (*Id.* at 2.) When confidential mail is inspected, ACJ staff is to "limit the inspection to a search for physical items that may be included in addition to the correspondence and shall not read the content of the correspondence itself." (*Id.*)

In certain instances, inmates may have their mail privileges suspended or restricted. (*Id.*) This includes if staff become aware that an inmate is sending mail that threatens violence against certain persons, including government officials, victims, or witnesses; or if incoming or outgoing mail represents "a threat to the security of the facility, staff or the public." (*Id.*) The Anoka County Sheriff's Office policy on disciplinary segregation specifies, however, that at no time should legal mail be suspended from access or delivery. (ECF No. 376 at 21.)

The Anoka County Sheriff's Office also has a written policy addressing inmate's access to courts and counsel. (ECF No. 362-5.) This policy directs that "[a]ll communication between inmates and their attorneys is confidential, including . . . written communication . . . . The content of written attorney-client communication will not be reviewed or censored but the documents may be inspected for contraband." (*Id.* at 1.) ACJ

staff are also directed to open and inspect incoming legal correspondence "in the presence of the recipient inmate." (*Id.*)  The policy also directs ACJ staff that legal mail shall be handled in accordance with the Inmate Mail Policy. (*Id.* at 2.)

The ACJ inmate handbook informs inmates that "[a]ll incoming mail will be opened and inspected for contraband and inappropriate material.  Only correspondence with attorneys, officers of the court, elected officials, and the officials of the Department of Corrections will be opened in your presence." (ECF No. 362-11 at 9.)  They are also informed that all outgoing mail will be opened and inspected for contraband, though confidential mail, including legal mail, "will not be read or censored." (*Id.*)  Inmates are directed not to seal the envelopes of outgoing mail. (*Id.*)

Legal mail arriving at the ACJ is typically marked as "legal mail." (*See* ECF No. 362-16 at 8.)  Two ACJ employees look through incoming mail to determine if it is legal mail. (*Id.* at 8-9.)  If an inmate has outgoing legal mail being sent to their attorney, or to other governmental entities or organizations discussed in the mail policy, inmates inform jail deputies that it is legal mail and deputies are to seal the legal mail in front of the inmate. (*Id.* at 10.)

In certain cases, Anoka County Sheriff's Detectives contact the ACJ for the purpose of collecting a particular inmate's non-confidential mail. (ECF No. 362-13 at 13.)  Detectives do this by contacting Lieutenant Sheila Larson. (*Id.* at 13-14.)  Lieutenant Larson is the administrative lieutenant in the jail division for the Anoka County Sheriff's Office. (*Id.* at 4.)  She oversees all data that comes into and goes out of the ACJ, contract staff and vendors in the jail, and the warrant division of the sheriff's office. (*Id.* at 5.)

Once a detective makes a request to receive copies of an inmate's incoming and outgoing nonconfidential mail, it is broadcast through the ACJ's shift briefings. (*Id.* at 14.) ACJ employees scan these letters, which are emailed to Lieutenant Larson. (*Id.*) Original outgoing letters are then put in the outgoing mail, so there are no additional copies made of these letters. (*Id.*) Lieutenant Larson then forwards the scans to the requesting detective. (*Id.*) She does not review these letters for their content and instead may just "scroll through to make sure it's a good scan because sometimes they're upside down or twisted or whatever." (*Id.* at 15.) Sometimes she does not have the time to scroll through scans and simply forwards them to the requesting detective. (*See id.*)

### b. Telephone Policy

The Anoka County Sheriff's Office also has a written policy that "establishes guidelines for permitting inmates to access and use telephones." (ECF No. 362-15 at 1.) Inmates housed in general population are "permitted reasonable access to public telephones at scheduled times in the dayrooms to make calls at the inmate's expense unless such access may cause an unsafe situation for the facility, staff or other inmates." (*Id.*) Inmates housed in high-security or administrative segregation are allowed to use the public telephones in the dayroom "during the time allocated for that classification of inmate to utilize that space." (*Id.* at 2.) While inmates in disciplinary segregation may have their telephone privileges restricted or denied, there is an exception for making calls to attorneys. (ECF No. 376 at 21.)

All calls are monitored and recorded, except calls to verified attorneys. (ECF No. 362-15 at 1.) In order to facilitate calls between inmates and their attorneys, inmates are

advised in writing when they are booked and in the inmate handbook that "it is their responsibility to provide the jail with attorney contact information.  Once this information has been provided, it will be entered into the inmate telephone system to ensure the inmate has toll-free and non-recorded access to their attorney."  (*Id.*)  The inmate handbook specifically provides that:

> The main telephone number for the Anoka County Public Defender's Office . . . other Minnesota public defenders offices, and numerous other legal assistance agencies have been programmed into our telephone system as toll-free calls. These calls are not collect and are not subject to monitoring and recording.  If you have a private attorney, fill out a kite with the name and telephone number of your attorney.  After we have verified the information and entered the number into our system, you will be able to place a toll free, non-recorded call to your private attorney.

(ECF No. 362-11 at 13.)

Other written policy provided to ACJ officials addresses telephonic communication between attorneys and inmates.  The policy addressing inmates' access to courts and counsel provides that telephone conversations between inmates and their attorneys is confidential.  (ECF No. 362-5 at 1.)  A daily training bulletin issued by the Anoka County Sheriff's Office also informs ACJ staff that "[c]alls between the inmate and his/her attorney shall be deemed confidential and shall not be monitored, eavesdropped upon or recorded. Inmates are responsible for supplying the Jail staff with their attorney's telephone number so it can be verified and programmed into the telephone system."  (ECF No. 362-16 at 1; *see also* ECF No. 362-13 at 11-12 (explaining how phone numbers enter the computer system when inmates inform ACJ officials of the phone number).)

In Unit 5, there are multiple phones for inmates to use; in Unit 4, however, there is a single telephone available for inmates.  (ECF No. 361 ¶ 3.)  Anoka County Sheriff's Detectives may use an online system for the purpose of listening to recorded phone calls. (ECF No. 362-13 at 12.)

### c.  Law Library Policy

The policy addressing inmate's access to courts and counsel also provides that inmates should have reasonable access to legal materials.  (ECF No. 362-5 at 1.)  The ACJ has a law library for inmates' use.  (*See* ECF No. 362-11 at 18.)  Per the inmate handbook:

> A law library is available for use during your recreation time. The law library is designed to assist you in doing basic legal research pertaining to your criminal case.  No copies will be made.  If this library does not meet your needs, please talk to your public defender, attorney, or legal counsel to get additional information or assistance.  Use the law library before attending recreation.  Once you enter the gym, you may not go back into the law library that day.

(*Id.*)  Time spent in the law library is included in recreation time when inmates are outside their cells.  (*See id.*)  Inmates that are pro se may request extra time in the law library but must provide proof of pro se status, and the inmate must be pro se on the charge for which they are in custody at the ACJ.  (*See id.* at 15; *see also* ECF No. 361 ¶¶ 8-9 (providing that unless an inmate is pro se, they can use the library during their "one-hour out for recreation").)  Per the disciplinary segregation policy, inmates in segregation are required to have "the same access to reading materials and legal materials as the general population inmates" unless (1) "the restriction is directed by a court of law;" or (2) "there is a reasonable basis to believe the materials will be used for illegal purposes or pose a direct

threat to the security and safety of the facility." (ECF No. 376 at 21.)

The law library includes a number of legal resources detailing federal and state criminal and civil law. (ECF No. 1-1 at 14.) There is also a list of contacts that can provide further legal guidance. (*Id.* at 15-16.) Normally, there is a typewriter and a computer. (ECF No. 361 ¶ 8.) This computer has "limited access to certain software, such as word processing software and software to view electronic discovery." (*Id.*) It is not connected to the internet. (*Id.*) In April of 2019, an inmate not involved in this lawsuit downloaded illegal content to the law library computer. (*Id.* ¶ 10.) The computer was thus removed from the law library by the criminal investigative division of the Anoka County Sheriff's Office for investigative purposes and cleaning. (*Id.*) A new computer was purchased in November 2019; from April through November, inmates were without a computer, but "were still permitted to possess written discovery and legal papers, and could meet in person with their lawyers who were allowed to bring laptop computers of their own to meet with their clients." (*Id.*)

### d. Cell Search Policy

The Anoka County Sheriff's Office has a policy detailing different searches permitted at the ACJ. (*See generally* ECF No. 362-20.) The purpose of this policy "is to provide clear direction on maintaining the safety and security of the facility by conducting searches, in balance with protecting the rights afforded by the United States Constitution." (*Id.* at 1.) ACJ staff are instructed to "take immediate action to seek contraband when practicable." (*Id.* at 6.) Pursuant to the policy, cells are to be searched daily by deputies. (*Id.* at 7.) Inmates are not allowed to remain in a cell being searched but may observe the

search from outside of their cell.  (*Id.*)  If a deputy locates weapons or contraband during a cell search, it is to be "processed in accordance with current evidence procedures."  (*Id.*)

### 3.  Events While Plaintiffs Were in Custody at the ACJ

### a.  May 2019 Seizure of Hari's Discovery Materials

When Hari was disciplined on May 26, 2019, for tampering with an electrical outlet, she was placed in pre-hearing lockdown and transported to Unit 4.  (*See* ECF No. 361 ¶ 12; ECF No. 362-7 at 1; ECF No. 362-18 at 3.)  Because Hari had been previously classified as a maximum custody inmate and flagged as an escape risk, and because her infraction posed a security risk for the jail, "staff removed all personal property from her cell in Unit 5 and transferred her to Unit 4 without her personal property."  (ECF No. 361 ¶ 12.)  The seizure of personal property "is reserved for serious situations when the inmate has a prior or existing security classification and nevertheless continues to violate ACJ protocols or rules."  (*Id.* ¶ 15.)  Consistent with practice and training in the ACJ, Hari's property was inventoried, stored in blue plastic bags, and locked in a secure cage in a locked room near Unit 4.  (*Id.* ¶ 14.)

On May 28, 2019, Hari filed a grievance complaining that her property, including her glasses and legal discovery, had been seized.  (ECF No. 362-9 at 1.)  An ACJ staff member responded, stating, "[d]ue to your violation you were moved to Unit 4.  All your property was inventoried and sealed.  You may request these items from your housing deputy."  (*Id.*)  On June 6, 2019, when filing a grievance regarding a phone call, Hari mentioned that she still did not have her glasses or discovery materials, she still needed a computer to review materials, and requested access to the law library.  (*Id.* at 3.)

Hari later completed a transfer of property request and Investigator Chad M. Spahn of the Federal Defender's Office for the District of Minnesota picked up her property on June 12, 2019.  (ECF No. 374-1 at 20.)  On June 13, 2019, Deputy Joann Maro went to the property bags assigned to Hari and did not find any additional discovery paperwork.[6]  (ECF No. 376 at 22.)

On June 17, 2019, Hari's attorneys in her then-pending criminal case filed a motion to continue the deadline to file pretrial motions and the pretrial motions hearing.  (ECF No. 374-1 at 21-23.[7])  Her attorneys noted there was not a computer available for Hari to review video, audio, and photographic discovery; that Hari's paper discovery, including legal paperwork and attorney/client privileged notes, had been taken from her when she was placed in administrative segregation; and that she had not had access to her discovery until June 17, 2019.  (*Id.* at 22.)  Hari requested a 30-day continuance of deadlines to review the discovery that had been seized.  (*Id.*)  Hari's attorneys also requested this continuance on the basis that:

> Additional discovery, provided under a protective order, was also recently received and has not yet been shared with [Ms.] Hari.  Thus, counsel or an employee of the Office of the Federal Defender will need to be present to share video, audio, photographic and protected discovery with [Ms.] Hari at the Anoka County Jail, a time consuming task.

(*Id.*)  The Government did not oppose Hari's request for a continuance, noting that while

---

[6] Hari disputes this fact, and argues that Deputy Maro gave her additional discovery materials on June 13.  (*See* ECF No. 1-1 at 34.)  She then requested that the video of Deputy Maro finding these additional discovery materials be preserved.  (*Id.* at 35.)  This request was denied.  (*Id.*)

[7] This motion is also available on the public docket of Hari's criminal case in this district.  *See United States v. Hari*, ECF No. 78.

it did not dispute that an inmate in segregation should be able to review discovery, Hari was "partly responsible" for her written discovery being seized due to "disabl[ing] a security device in [her] cell." (*Id.* at 24.[8]) The court granted Hari's motion to continue. (*Id.* at 26.[9]) Subsequent motions to continue Hari's criminal case were filed by her attorneys, including a motion to continue the trial date on the basis that Hari's newly-appointed counsel would be receiving another batch of discovery for review. *See United States v. Hari*, ECF No. 134.

### b. General Scanning of Hari's Mail

On June 6, 2019, Lieutenant Larson sent an email to various ACJ staff, including Sergeant Wood, reminding them that she had been receiving scans of Hari's legal mail, which she would "quickly delete." (ECF No. 376 at 3.) She reminded staff that she should "never get legal mail." (*Id.*) Scans that are sent to Lieutenant Larson drop off the ACJ server within 90 days. (*See* ECF No. 374-1 at 37-38.)

On June 20, 2019, Sergeant Wood sent an email to Lieutenant Larson expressing concern that Hari was marking all of her mail as legal mail and that she had sealed an envelope outside the presence of ACJ staff. (ECF No. 375 at 25.) Lieutenant Larson responded, suggesting the scanning of the envelopes of Hari's legal mail. (*Id.*) Sergeant Wood again responded that she thought this was a "good idea" and would "include it in the briefing notes." (*Id.*)

On July 1, 2019, ACJ staff were notified by way of a shift briefing that Hari's non-

---

[8] *See also United States v. Hari*, ECF No. 80.
[9] *See also United States v. Hari*, ECF No. 81.

confidential mail, including the envelopes, should be scanned.  (ECF No. 362-14 at 3.)  At the time, Hari was in administrative segregation and housed in Unit 4 of the ACJ.[10]  (*Id.*)  Hari's legal mail envelopes were to be scanned and forwarded to the duty sergeant.  (*Id.*)  ACJ staff were explicitly told, "**DO NOT SCAN LEGAL MAIL**" regarding Hari's mail.  (*Id.*)  This scanning continued throughout July and August 2019.  (*Id.* at 1-2, 4.)  During this time, ACJ staff were repeatedly reminded not to scan Hari's legal mail.  (*See id.*)

### c. Two Instances of Scanning of Hari's Handwritten Notes

As stated above, after the disciplinary incident on May 26, 2019, wherein Hari had tampered with an electrical outlet in her cell, she was housed in disciplinary segregation in Unit 4.  (ECF No. 362-18 at 3.)  Inmates in Unit 4 are subject to routine shakedowns in their cells.  (ECF No. 360 ¶ 5; *see also* ECF No. 362-20 at 7 (discussing cell search policy).)  Deputies at the ACJ are instructed "to physically search through all areas of the cell, including clothing, cots, mattresses, pillows, personal effects, and papers" as well as "to physically 'thumb through' papers found in an inmate's cell to ensure the inmate is not hiding contraband between those pages."  (*Id.* ¶ 7.)  Deputies are instructed not to "substantively read" the contents of papers.  (*Id.*)

On June 2, 2019, Deputy Jesse Rasmussen completed a shakedown of Hari's cell.  (ECF No. 375 at 27.)  Hari was still assigned to Unit 4 at this time (ECF No. 362-18 at 3.)  Deputy Rasmussen "[n]oticed a letter written in code on [Hari's] desk," and that Hari had written the cardinal directions on the respective walls of her cell.  (ECF No. 375 at 27.)  In

---

[10] Hari was transferred to the medical unit on July 16, 2019, after she went on a hunger strike.  *Hari I*, 2020 WL 7249816, at *3-4.  Hari remained in administrative segregation while she was in the medical unit.  *Id.* at *4.

an inventory and shakedown sheet from that date, Deputy Rasmussen wrote that nothing was found.  (ECF No. 375 at 28.[11])

A two-page handwritten document, however, was taken from Hari's cell and scanned.  This scanned document is a series of what appear to be encrypted letters and numbers.  (ECF No. 363-5 at 2-4.)  The document is not identified as mail, let alone legal mail, and is not addressed to any person.  (*Id.*; *but see* ECF No. 378-1 at 1-3 (Hari's alleged original version of the document, which is three pages.)[12])  Lieutenant Larson forwarded the document to a Ryan Westby[13] on June 3, 2019, along with the following message: "Ryan, This was found during a shakedown in Hari's cell on June 1st.  It wasn't mail, just written out on a piece of paper.  Unsure if it's some kind of code, or [she's] testing us, or what, but forwarding it to you."  (ECF No. 363-5 at 1.)  Hari did not grieve the seizure of this document or otherwise ask for its return.

A second seizure occurred on July 11, 2019.  (*See generally* ECF No. 360.)  Hari was still assigned to Unit 4 in Cell 402.  (ECF No. 362-18 at 3.)  Laughlin was assigned to Unit 4 in Cell 403.  (ECF No. 363-2 at 2.)  While performing a shakedown, Deputy Jonathan Evans observed a stack of papers on top of a manilla envelope near the bookshelf area of Hari's cell.  (ECF No. 360 ¶ 9.)  He did not notice any markings indicating that the

---

[11] The photocopy of this exhibit did not produce a legible copy.  Plaintiffs, however, filed this exhibit at a different juncture in this lawsuit.  (*See* ECF No. 184-1 at 1.)

[12] County Defendants have asked the Court to exclude this exhibit, and others, on the basis that the evidence was not disclosed to them during discovery.  (ECF No. 387 at 1-3.)  The Court finds that Plaintiffs' failure to disclose this exhibit, and the others, was not substantially justified or harmless, and thus may exclude these exhibits from consideration on the present motion.  *See Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702-03 (8th Cir. 2018).  The Court will discuss further, however, that the differences in the exhibits are immaterial to its eventual conclusions of law.  *See infra.*

[13] Ryan Westby is not party to this suit.

papers were legal mail. (*Id.*) These pages were also separate and apart from folders in Hari's cell that had been marked as legal materials. (*Id.* ¶ 13.)

While paging through the stack of unmarked papers, Deputy Evans recognized words such as "fuse," "length," "powder," "rocket grenades," and casings," which he understood to be words related to explosive devices, on two of the pages. (*Id.* ¶ 10.) He removed the two pages because he believed they posed a security threat to the ACJ; in addition, he found the pages particularly concerning considering Hari previously attempted escape from custody, tampered with the electrical wiring in her cell, and was at the time facing criminal charges related to explosives. (*Id.* ¶¶ 11-12.) The two pages appear to be notes and are not addressed to any particular individual. (ECF No. 363-5 at 6-7.)

Deputy Evans took the two pages to the on-duty sergeant, who instructed him to scan the pages to Lieutenant Larson and then return them to Hari's cell. (ECF No. 360 ¶ 14.) He scanned and sent them to Lieutenant Larson. (*Id.* ¶ 15.) This was also recorded in Evans's observation log. (*See* ECF No. 362-19 at 56 ("[w]hile conducting a cell shakedown I came across a sheet of paper that raised concerns about the safety and security of the facility, it was scanned and returned to the Inmate.").) Lieutenant Larson forwarded the two pages to Ryan Westby without comment. (ECF No. 363-5 at 5.) The scan was forwarded by Westby to Brenda Kane of the FBI with Westby noting that the pages "looked like notes." (ECF No. 376 at 7.)

Hari has always disputed Deputy Evan's version of events. (*See, e.g.*, Sec. Am. Compl. ¶ 20.) She claims that Laughlin was able to observe this search "from his own cell next door in the reflection of the windows facing both cells across the day room," and that

Deputy Evans removed the notes from an envelope indicating legal mail was contained therein.  (*Id.*; ECF No. 362-9 at 4.)  She has also submitted an exhibit which is purportedly the outside of the envelope from which Deputy Evans removed the notes.[14]  (ECF No. 376 at 4-5.)

Hari grieved Deputy Evan's removal of the two pages that day and wrote that Deputy Evans had in fact removed the material from an envelope marked "Legal Mail," "Legal Mail/Seal Before Inmate," and addressed to her attorney.  (ECF No. 362-9 at 4.) Sergeant Wood responded that nothing on the two pages indicated it was legal mail "and the content was of a concern to the safety and security of the jail [and] was removed for further review.  The safety of our facility dictate [sic] certain actions."  (*Id.*)  Hari appealed the following day.  (*Id.* at 5.)  In denying her appeal, ACJ staff reiterated that the pages had not been marked as legal mail, that it was a potential safety and security issue, and that no copies had been made.  (*Id.*)

### d.  Other Mail Issues

On July 13, 2019, Laughlin submitted an inmate grievance generally asking why ACJ officials opened "our" legal mail.  (ECF No. 1-1 at 25.)  Deputy Arvidson[15] responded that inmates are not allowed to have "[e]nvelopes from mail that is sent to you legal or not."  (*Id.*)  Laughlin appealed this grievance July 14, 2019, again stating generally that "officers are opening legal mail before we get it."  (*Id.* at 42.)  Sergeant Wood responded by asking Laughlin if his legal mail had ever been opened outside of his presence and for

---

[14] County Defendants also ask for the exclusion of this document on the basis that Hari did not produce it during discovery. (ECF No. 387 at 1-3.)
[15] Deputy Arvidson is not party to this suit.

Laughlin to specify the officer that had opened his legal mail. (*Id.*) Laughlin filed an additional appeal to the July 13 grievance. (*Id.* at 47.)

Hari filed a request on July 13, 2019, for copies of her scanned outgoing mail. (ECF No. 376 at 14-15.) Sergeant Wood twice informed Hari that staff at the ACJ did not keep copies of her mail. (*Id.*)

### e. Plaintiffs' Phone Access and Grievances

When Laughlin filed his July 13 grievance, he also asked why inmates did not have access to a private phone to speak with counsel. (ECF No. 1-1 at 25.) In his July 14 appeal, Laughlin again complained that inmates were not given a private phone. (ECF No. 1-1 at 42.) Sergeant Wood responded that the ACJ was required to provide inmates with access to a phone, but not a private phone. (*Id.*)

Plaintiffs were in Unit 4 while they complained about access to a private phone. This meant that they had access to one phone. (*See* ECF No. 361 ¶ 4.) The telephone area in Unit 4 is located in a corner next to the main entrance to the cell block and abuts the control room. (ECF No. 363-6 at 1; *see also* ECF No. 363-4 at 8-11.)

Hari filed an inmate request on June 5, 2019, letting ACJ staff know that she had a phone call with her attorney scheduled for June 6. (*See* ECF No. 362-9 at 3.) Unsatisfied with the response, she filed a grievance the following day. (*Id.*) In denying her grievance, Sergeant Wood wrote that it was not possible to accommodate specific times for Hari to call her attorney, and that she would need to make calls "on your hour out or during your extra time out or during your extra time out if the deputies can give you more time since you are on [administrative segregation.]" (*Id.*) On July 19, Hari's attorney contacted the

ACJ to request an "unmonitored" telephone call with Hari on a specific date and time. (ECF No. 376 at 38-39.)  A detention sergeant responded that the ACJ did not have the staff to facilitate a specific phone call, but that Hari could request the attorney's number be entered into the system and that Hari could call the attorney from the housing unit.  (*Id.* at 38.)  The detention sergeant reiterated that attorney calls are not monitored.  (*Id.*)

### f.  Plaintiffs' General Access to Discovery and Grievances

On May 11, 2019, Hari filed an inmate request to have access to a computer to view and review audio, video, and photographic discovery.  (ECF No. 1-1 at 12.)  Sergeant Wood informed her that the computer was currently unavailable for inmates' use.  (*Id.*)  Laughlin filed a separate grievance on July 13, 2019, asking why inmates did not have access to a computer in order to "look at our evidence against us or listen too [sic] it?"  (ECF No. 1-1 at 27.)  A Deputy "JD 441" replied that Laughlin could set up the use of a computer through the programs department.  (*Id.*)  Laughlin appealed this grievance the following day, again complaining that inmates were not able to access computers and that the computer was broken.  (ECF No. 1-1 at 33.)  In response, Laughlin was asked what he needed a computer for.  (*Id.*)

### D.  Discussion

The Second Amended Complaint does not list specific counts. Plaintiffs have alleged a variety of claims against a number of Anoka County officials who were working at the ACJ during the relevant time period.  The Second Amended Complaint states that both Plaintiffs claim that Anoka County Sheriff James Stuart, Deputy Rasmussen, Deputy Evans, Lieutenant Larson, and Sergeant Wood violated Plaintiffs' rights under the 1st, 5th,

6th, and 14th Amendments "for violation of their right to access to courts, violation of their right to counsel, [and] 1st Amendment retaliation." (Sec. Am. Compl. ¶ 1.) Each Defendant is sued in their personal and official capacities. (*Id.* ¶ 7.) Both Plaintiffs request injunctive relief, as well as compensatory and punitive damages pursuant to 42 U.S.C. § 1983. (*Id.* at pp. 1, 12-13.)

Plaintiffs allege that policies governing their legal mail, telephone access to speak privately with their attorneys, and access to a law library with a computer deprived them of their right to access the courts. Both Plaintiffs have alleged that their legal mail was improperly handled, with some specific instances alleged. Hari alleges that her rights were violated by the storing of certain property that was subject to attorney-client privilege while she was in disciplinary segregation. Lastly, Laughlin alleges that he was retaliated against by ACJ officials for filing grievances and this lawsuit by being placed in a "wet cell" in booking for hours, in addition to being threatened, intimidated, and scolded by ACJ officials.

### 1. Fifth Amendment Claims

As a preliminary matter, Plaintiffs' claim that County Defendants violated their Fifth Amendment rights through their various actions fails as a matter of law. "The Fifth Amendment only applies to actions taken by the federal government." *Labeau v. Sorenson*, No. 18-cv-651 (NEB/LIB), 2019 WL 7284109, at *5 (citing *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010)). None of the County Defendants are federal government actors, and thus the Court recommends granting summary judgment to the extent Plaintiffs assert Fifth Amendment violations against County Defendants.

## 2. First, Sixth, and Fourteenth Amendment Claims

Plaintiffs contend in their memorandum in opposition that they have standalone First and Sixth Amendment claims. (*See, e.g.*, ECF No. 370 at 31 ("The 6th Amendment right to counsel is not a derived right, it is a fundamental right and a violation forms the basis for a stand-alone claim."); ECF No. 371 at 3 ("A prisoner has a 1st Amendment free speech right to communicate with his attorney by mail, separate and apart from his constitutional right to access the courts."); ECF No. 371 at 13 ("[A] 1st Amendment claim for interference with attorney-client communications is properly construed as a free speech claim; a Sixth Amendment claim for violation of attorney-client privilege is properly construed as a right to counsel claim.").) They urge the Court to consider these claims as separate and apart from access to court claims. County Defendants argue that Plaintiffs are incorrect and have no standalone First or Sixth Amendment claims, and that the Court should construe Plaintiffs' claims as access to court claims. (ECF No. 387 at 3-5.)

Plaintiffs do, however, couch their Fourteenth Amendment claims as access to court claims. (*See* ECF No. 371 at 13.) Though the specific constitutional provision that gives rise to access to courts claims is unsettled, *see, e.g.*, *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002), "[i]t is well-established that an inmate has a constitutional right to meaningful access to the courts." *Berdella v. Delo*, 972 F.2d 204, 209 (8th Cir. 1992).

"For a prisoner to prevail on an access-to-courts claim, he must demonstrate actual injury." *Jackson v. Smith*, No. 16-cv-1406 (DSD/KMM), 2018 WL 707436, at *7 (D. Minn. Jan. 8, 2018) (citing *Lewis v. Casey*, 518 U.S. 343, 349 (1996)), *report and recommendation adopted*, 2018 WL 707489 (D. Minn. Feb. 5, 2018). As the Eighth Circuit

28

has summarized:

> [t]o prove a violation of the right of meaningful access to the courts, a prisoner must establish that the [county] has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hinderance of a nonfrivolous and arguably meritorious underlying legal claim.

*Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (quotation omitted). "It is insufficient to show that [the] conduct made litigation inconvenient. Instead the prisoner must show that this conduct actually prevented the prisoner from litigating the claim." *Beck v. Pawlenty*, No. 04-cv-686 (MJD/JJG), 2006 WL 2506993, at *5 (D. Minn. Aug. 29, 2006) (citing *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)).

In *Gardner v. Howard*, the Eighth Circuit observed:

> The act of opening incoming mail does not injure an inmate's right to access the courts. The policy that incoming confidential legal mail should be opened in inmates' presence instead serves the prophylactic purpose of assuring them that confidential attorney-client mail has not been improperly read in the guise of searching for contraband.

109 F.3d 427, 431 (8th Cir. 1997). "Given this limited purpose, inadvertent opening of legal mail cannot be actionable under § 1983 . . . because '[t]o assert a successful claim for denial of meaningful access to the courts . . . an inmate must demonstrate that he suffered prejudice.'" *Id.* (quoting *Berdella v. Delo*, 972 F.2d 204, 210 (8th Cir. 1992)).

Plaintiffs must also demonstrate that they were prejudiced in order to establish a Sixth Amendment violation as it would relate to the claims. *See United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) ("To establish a sixth amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the

attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice") (citations omitted); *see also Thomsen v. Ross*, 368 F. Supp. 2d 961, 974 (D. Minn. 2005) (finding that a prisoner's Sixth Amendment claim failed for "failure to show prejudice from any interference with his mail.");[16] *Andersen v. Cty. of Becker*, No. 08-cv-5687 (ADM/RLE), 2009 WL 3164769, at *12 (D. Minn. Sept. 28, 2009) (writing in the context of the recording and monitoring of phone calls that "Plaintiffs must demonstrate that there was an intrusion into the attorney-client communication and that there was some prejudice to them.") (citing *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

This leaves Plaintiffs' standalone First Amendment Claims. County Defendants cite to no law which precludes Plaintiffs from pursuing standalone First Amendment claims, and instead moves straight to their argument that Plaintiffs must show actual injury in order to survive summary judgment on their access to courts claims. (*See* ECF No. 387 at 5.) Plaintiffs largely rely on non-binding caselaw from outside this Circuit for the proposition that no actual injury is necessary to state a claim for a First Amendment free speech claim. (*See* ECF No. 371 at 3.)

It is possible to state a First Amendment claim when a prisoner generally alleges that prison officials have read and inventoried legal mail or searched a container containing legal material outside of a prisoner's view. *See Foster v. Helling*, 210 F.3d 738, 2000 WL 328116, at *1 (8th Cir 2000) (per curiam) (table decision); *see also Powells v. Minnehaha*

---

[16] The *Thomsen* Court also acknowledged that Plaintiffs must demonstrate injury on Fourteenth Amendment claims involving access to the courts. 368 F. Supp. 2d at 974 (citing *Lewis v. Casey*, 518 U.S. 343, 349 (1996)).

*Cty. Sheriff Dep't*, 198 F.3d 711, 712 (8th Cir 1999) (prisoner plaintiff stated a constitutional claim when he alleged officers opened his legal mail when he was not present). We are now at the summary judgement stage, however, and thus additional analysis is required.

"The United States Supreme Court has held that an inmate's privileged mail may not be opened for inspections for contraband outside the presence of the inmate and has defined privileged mail as 'mail to or from an inmate's attorney and identified as such.'" *Moore v. Schuetzle*, 354 F. Supp. 2d 1065, 1078 (D.N.D. 2005) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 574 (1974)) (additional citation omitted); *see also Beaulieu v. Ludeman*, 690 F.3d 1017, 1037 (8th Cir. 2012) ("[P]rivileged prisoner mail, *that is mail to or from an inmate's attorney and identified as such*, may not be opened for inspections for contraband except in the presence of the prisoner.") (quoting *Gardner*, 109 F.3d at 430) (emphasis added); *Jensen v. Klecker*, 648 F.2d 1179, 1183-84 (8th Cir. 1981) ("*Wolff* requires that [legal mail] be specially marked as originating from an attorney, with that attorneys [sic] name and address."). "The question of whether a particular piece of correspondence is 'legal mail' is a question of law." *Moore*, 354 F. Supp. 2d at 1078 (citing *Sallier v. Brooks*, 343 F.3d 868, 873 (6th Cir. 2003)).

Further, the Eighth Circuit has held that jail security is a sufficiently important governmental interest to justify limitations on an inmate's First Amendment rights. *See Smith v. Delo*, 995 F.2d 827, 830 (8th Cir. 1993) (holding that officials were justified in screening outgoing nonlegal mail for contraband and threats); *see also Davis v. Norris*, 249 F.3d 800, 801 (8th Cir. 2001) ("Prisoners' First Amendment rights may be circumscribed

if legitimate penological objectives outweigh preservation of their rights.") (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).  The Eighth Circuit has also held that the photocopying and sharing of nonlegal mail with other law enforcement officers does not chill a prisoner's communications in violation of the First Amendment right to free speech. *See Gassler v. Wood*, 14 F.3d 406, 408-09 (8th Cir. 1994).  As the Eighth Circuit wrote in *Gassler*:

> where the correspondence was simply being sent to another law enforcement officer so that he could examine it with the same security objectives in mind as justified examination by the prison authorities, we see no material enlargement on whatever "chill" on prisoner communication already existed by dint of the authorities' uncontroverted right to examine.

14 F.3d at 409.

And, while this Court's research has revealed no Eighth Circuit cases distinguishing between First Amendment access to courts claims and First Amendment free speech claims, other Circuits have made this distinction.  In *Blair-Hanson v. Johnson*, a court in this District discussed certain Circuit's, namely the Third, Ninth, and Eleventh's, considerations of freedom of speech claims under the First Amendment.  No. 19-cv-2195 (NEB/TNL), 2020 WL 5105775, at *4 (D. Minn. Aug. 31, 2020); *see also Moore v. Hoeven*, No. 1:08-cv-028, 2008 WL 1902451, at *10-12 (D.N.D. Apr. 28, 2008) (discussing a similar distinction).  Many of these cases are the cases on which Plaintiffs rely.  These cases, however, require that an inmate show a "pattern or practice" of the opening of their incoming legal mail outside their presence in order to sustain a freedom of speech claim where there is no showing of an actual injury.  *See Hayes v. Idaho Corr.*

*Ctr.*, 849 F.3d 1204, 1212 (9th Cir. 2017) (finding a prisoner alleged a freedom of speech First Amendment claim when officials opened two incoming pieces of legal mail outside his presence and thereby chilling his right to privately confer with counsel); *Shreane v. Holt*, 482 F. App'x 674, 676 (3d Cir. 2012) ("Prisoners may establish a violation of the First Amendment without establishing an actual injury where there is a pattern and practice of opening properly marked incoming legal mail outside of the prisoner's presence.") (citation omitted); *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008) (addressing whether the "pattern and practice of opening (but not reading) [Plaintiff's] clearly marked [incoming] attorney mail outside his presence sufficiently chills, inhibits, or interferes with [Plaintiff's] ability to speak, protest, and complain openly to his attorney so as to infringe on his right to free speech.").

These cases, however, involve only legal mail. Thus, the Court considers Hari's claim regarding the storage of her discovery materials under an access to courts, Sixth, and Fourteenth Amendments. It considers the claims regarding Plaintiffs' legal mail both like access to courts, Sixth, and Fourteenth Amendment claims (whereby the record would need to demonstrate injury or prejudice to Plaintiffs) and under a separate First Amendment freedom of speech analysis (whereby the record would need to demonstrate a pattern or practice of certain violations).

Viewing the uncontroverted factual record in favor of Plaintiffs, the Court finds that summary judgment is appropriate on the access to courts, Sixth, and Fourteenth Amendment claims because no reasonable juror could find that Plaintiffs suffered an actual injury or were demonstrably prejudiced. And, as relates to the legal mail claims, the record

establishes for various reasons that there were no constitutional violations. Thus, County Defendants are entitled to judgement as a matter of law.

### a. Claims Asserted by Laughlin

Laughlin has alleged that he was "handed legal mail on several occasions that was opened and missing the envelope." (Sec. Am. Compl. ¶ 9.) Here, the record shows that Laughlin filed a grievance inquiring about the mail practice generally, asking why ACJ staff opened up "our" legal mail. (ECF No. 1-1 at 25.) When appealing this grievance, staff inquired as to whether this had ever happened specifically to Laughlin. (*Id.* at 42.)

Laughlin also filed a general grievance about access to a private phone (ECF No. 1-1 at 25) and a grievance asking why inmates did not have access to a computer. (*Id.* at 27.) He has not provided further details as to how his right to access the courts and/or his Sixth Amendment right to counsel were violated by ACJ staff. Nor has he provided any specific instance of interference with his legal mail which would implicate his First Amendment rights. In response to County Defendants' interrogatories requesting Laughlin provide specific instances of potential constitutional violations (*see* ECF No. 362-21 at 4-5), he responded that he had no knowledge of any specific violations. (*See* ECF No. 345 at 1.)

Quite simply, Laughlin has produced little to no evidence to support his threadbare allegations on his claims, much less a pattern or practice. He also has provided no evidence that he suffered an actual injury, and thus there is no genuine issue for trial on his claims. *See Gannon Int'l*, 684 F.3d at 792; *Turner*, 784 F.3d at 489. Accordingly, the Court recommends that summary judgment be entered in favor of County Defendants on Laughlin's claims.

### b.  Claims Asserted by Hari

### i.  Storing of Discovery Materials

Hari has alleged that ACJ staff improperly deprived her of discovery materials, including legal mail and other privileged notes, for 22 days when she was moved from Unit 5 to pre-hearing lockdown (and eventually administrative segregation) in Unit 4.  (Sec. Am. Compl. ¶¶ 13, 28, 30-31.)  She alleges that the deprivation of these documents injured her because her criminal case was continued while ACJ staff held on to these documents. (*Id.* ¶ 32.)

As an initial matter, Hari has not established an actual injury through the holding of these discovery materials while she was in lockdown or administrative segregation. Contrary to her argument, the continuance of Hari's criminal matter was not an actual injury.  *See Hartsfield*, 511 F.3d at 832; *see also  Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003) ("There is nothing in the record to show Kind lost a specific claim in any legal proceeding as a result of the jail's alleged inference."); *Thomsen*, 368 F. Supp. 2d at 974 ("Neither plaintiff nor his trial counsel have identified any conceivable way in which this information, even if read by jail officials, interfered with his defense or hindered his access to the courts."); *de la Garza v. Fabian*, No. 06-cv-208 (RHK/JJG), 2010 WL 106826, at *5 (D. Minn. Jan. 6, 2010) (collecting cases and concluding, "[t]o establish such hinderance, there must be some evidence that conduct by prison officials adversely affected the *outcome* of a prisoner's litigation.") (emphasis added).  And, as even Hari's attorneys noted, the requested continuance to which she cites was also based on the fact that defense counsel had recently obtained additional discovery for review.  (*See* ECF No. 374-1 at 22.)

The record does not demonstrate that Hari was unable to present information in the course of her criminal case because she lacked access to these materials, and Hari has not provided evidence as to how these papers would have influenced the outcome of any substantive hearing or her trial. Further, "case law indicates that for a plaintiff to prevail on an access-to-courts claim, he must show that the defendant intended to prevent that access." *Jackson*, 2018 WL 707436, at *7 (citing *Scheeler v. City of St. Cloud, Minn.*, 402 F.3d 826, 830-31 (8th Cir. 2005)) (additional citation omitted). The record is devoid of any intentional action by any of the individual County Defendants to deprive Hari of this right.

Nor does the record indicate that Hari suffered the loss of his counsel's assistance by the storage of these materials. To the contrary, the record in Hari's criminal case shows that her claims on this issue were fully litigated. *See United States v. Hari*. As such, there is no constitutional violation and County Defendants are entitled to summary judgment on these claims.

In addition, ACJ officials had a legitimate penological interest in the temporary storage of Hari's materials. The Eighth Circuit has held that "withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest." *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997); *see also Cody v. Weber*, 256 F.3d 764, 767-70 (8th Cir. 2001). In those two cases, officials offered no justification for their intrusion. *See Goff*, 113 F.3d at 89-91; *Cody*, 256 F.3d at 768-69. This case is distinguishable because County Defendants give ample reason why Hari's personal property was taken and stored after her disciplinary violation.

This points the Court to the Supreme Court's balancing test articulated in *Turner v.*

*Safely*, which held that "when a prison regulation impinges on an inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. 482 U.S. 78, 89 (1987). To determine whether a challenged regulation is reasonably related to legitimate penological interests, relevant factors include: (1) whether there is a rational connection between the regulation and the interests advanced to justify it; (2) whether there are alternative means to preserve prisoners' rights; (3) the effect that accommodation of prisoners' rights will have on the prison resources; and (4) whether there is any reasonable alternative. *Id.* at 89-90.

At the time she was booked into the ACJ, Hari was already a maximum security prisoner based on her-then pending criminal charges related to the bombing of a mosque, her past conviction for child obduction, and attempted escape from a United States Marshal Service transport van. *Hari I*, 2020 WL 7249816, at *3. While housed in Unit 5, it was discovered that Hari was tampering with an electrical outlet in her cell, and on that basis, she was placed in pre-hearing lockdown and transported to Unit 4. (*See* ECF No. 361 ¶ 12; ECF No. 362-7 at 1; ECF No. 362-18 at 3.) She was eventually placed on administrative segregation and remained in Unit 4 until she left the ACJ.

The record shows that this disciplinary violation, which ACJ officials validly interpreted as a safety and security issue at the jail, demanded the temporary storing of all of Hari's personal property. (*See, e.g.*, ECF No. 362-2 at 4 ("Inmates placed in prehearing detention are subject to the property and privilege restrictions commensurate with segregated confinement."); ECF No. 361 ¶ 15 (stating seizure of personal property "is reserved for serious situations when the inmate has a prior or existing security classification

and nevertheless continues to violate ACJ protocols or rules.").)   Consistent with ACJ policy, Hari was still allowed other access to the courts via use of the phone, law library, and in-person visits with her attorney.  And Hari, consistent with what she was told when she grieved the loss of this property, received these materials back.

Finally, Hari has also not produced evidence that shows that the taking of her discovery materials resulted from County Defendants' intentional decision to deny her access to the courts.  *See Jackson*, 2018 WL 707436, at *7.  For all of these reasons, the Court finds that County Defendant's motion for summary judgment should be granted on these claims.

### ii. Scanning of Notes

Hari also alleges that two individual ACJ staff improperly tampered with her legal mail.  First, she alleges that Deputy Rasmussen seized an encrypted letter addressed to her attorney on June 2, 2019.  (Sec. Am. Compl. ¶¶ 16-18.)  She also alleges that on July 11, 2019, Deputy Evans removed a set of notes from her cell from an envelope indicating that its contents were legal mail.  (*Id.* ¶ 20.)

In opposition to County Defendants' motion, Hari has filed a number of exhibits which County Defendants argue should be excluded from the Court's analysis as a sanction for not producing them in discovery.  (*See* ECF No. 387 at 1-3.)  One of these exhibits purportedly shows that the encrypted letter taken by Deputy Rasmussen and scanned to Lieutenant Larson was legal mail.  (*See* ECF no. 378-1 at 1-4.)  Another is purportedly the envelope from which Deputy Evans removed Hari's notes on July 11, 2019.  (ECF No. 376 at 4-5.)

The Court has previously found that good cause exists to exclude these exhibits from the record because Plaintiffs were not substantially justified in failing to produce these documents in discovery, and their failure to produce these documents was not harmless. *See supra* p. 22 n.12.    But even if the Court were to consider this exhibit, and even assuming, *arguendo*, that the two pages of encrypted notes were part of a larger letter that was addressed to Hari's federal public defender, County Defendants are still entitled to summary judgment on the claim against Deputy Rasmussen, because the undisputed facts on the record show that no reasonable juror could find that Hari suffered an actual injury or was prejudiced by the scanning of the encrypted note. *Lewis*, 518 U.S. at 349. Nor has she demonstrated that the scanning of this note infringed upon her attorney-client privilege in such a way that she was prejudiced in her criminal case. *See Andersen*, 2009 WL 3164769. And, any argument that Hari makes that she felt unable to freely correspond with her lawyer does not rise to a Sixth Amendment violation. *Thomsen*, 368 F. Supp. 2d at 974 (citing *Lewis v. Cook Cty. Bd. of Comm'rs*, 6 F. App'x 428, 430 (7th Cir. 2001)).

The facts before the Court also show that Hari has not established a separate freedom of speech claim under the First Amendment. The scanning of Hari's nonlegal mail was justified by the ACJ's legitimate interest in jail security, particularly in light of Hari's criminal background, escape attempt, and disciplinary violation for tampering with an electrical outlet in her cell. *See Smith*, 995 F.2d at 830; *Davis*, 249 F.3d at 801; *see also Procunier v. Martinez*, 416 U.S. 396, 413 (1974) ("Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity

whether within or without the prison.  Similarly, prison officials may properly refuse to transmit encoded messages."), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).  For similar reasons, ACJ officials were entitled to forward Hari's nonlegal mail to other law enforcement officials.  *See Gassler*, 14 F.3d at 408-09.

And again, even assuming that this was a piece of legal mail (noting again that the exhibits filed by Hari could be properly excluded from the record), the record does not show a pattern or practice of ACJ officials reading Hari's legal mail or the opening of her incoming legal mail outside her presence.  *See, e.g.*, *Shreane*, 482 F. App'x at 676.

For similar reasons, the Court finds that County Defendants are entitled to summary judgment on Hari's claim that Deputy Evans violated her rights when he briefly removed a set of notes from her cell on July 11, 2019.  As an initial matter, the record does not reflect that these notes are legal mail, but rather notes.  *See, e.g.*, *Beaulieu*, 690 F.3d at 1037 (defining privileged mail as mail to or from an inmate's attorney and identified as such). True, Hari has consistently maintained that Laughlin was able to watch Deputy Evans through a reflection on July 11 when her notes were taken.  (*See* Sec. Am. Compl. ¶ 20.) She maintains that these notes were taken from an envelope marked "legal mail," and that Laughlin was able to witness these actions through the reflection in the glass of his cell. (*Id.*)  The Court notes again that the envelope Hari claims contained this note could be properly excluded because Hari did not tender it to County Defendants in discovery.  Even if not excluded, however, nothing on the record ties this particular envelope to Hari's notes except for her claim that the notes were inside this particular envelope and a declaration

signed by Laughlin supporting her claims.  (*See* ECF No. 384 at 3-4.[17])

County Defendants have also filed photographs of this area (ECF No. 363-4) and claim that it would be physically impossible for Laughlin to have seen this, because there was a stairway blocking Laughlin's view from that angle.  (*See, e.g.*, ECF No. 387 at 10.) Again, even assuming, *arguendo*, that Laughlin could see Deputy Evans while he searched Hari's cell, and that Deputy Evans *did* in fact remove these notes from an envelope, Hari's claim still cannot survive summary judgment.  No rational factfinder would believe that an individual would be able to read the title on an envelope from a reflection at the distance from which Laughlin purportedly viewed Deputy Evans' actions.

Further, there is no evidence that Hari suffered an actual injury on any nonfrivolous or arguably meritorious legal claim or that she was prejudiced by any possible intrusion into these materials.  Hari's separate freedom of speech claim also fails because the record does not establish a pattern or practice of ACJ officials reading her legal mail or opening her incoming legal mail outside her presence.  Accordingly, because Hari has not made an adequate showing as to necessary elements of her claims, and because the record as a whole shows that no reasonable factfinder could find in her favor, County Defendants are entitled to summary judgment on these claims as a matter of law.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Torgerson*, 643 F.3d at 1042-43.

### 3.  Official Capacity Claims

Plaintiffs are suing County Defendants in their official capacities and allege that

---

[17] This declaration is written in Hari's handwriting.  The Court discusses the declaration in further detail *infra* when discussing Laughlin's retaliation claim.

"official policies, practices, and customs of the Anoka County Jail, administered by Sheriff Stuart, caused some of the violations and injuries to the Plaintiffs."  (Sec. Am. Compl. ¶ 7.)  "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Gladden v. Richbourg*, 759 F.3d 960, 968 (8th Cir. 2014).

"A suit against a government official in his or her official capacity is 'another way of pleading an action against an entity of which an officer is an agent."  *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)).  Therefore, Plaintiffs "must show either that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner."  *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989) (citation omitted); *see also Angarita v. St. Louis Cty.*, 981 F.2d 1537, 1546 (8th Cir. 1992) ("A municipality may be held liable under Section 1983 only if a municipal custom or policy caused the deprivation of [a] right protected by the constitution or federal laws.").  An "official policy or custom must, of course, be the 'moving force of the constitutional violation' to establish liability."  *Thomsen*, 368 F. Supp. 2d at 969 (quoting *Monell*, 436 U.S. at 694).  "A governmental policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy."  *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (quotation omitted).  "A governmental custom involves a pattern of persistent

and widespread practices which become so permanent and well settled as to have the effect and force of law." *Id.*

### a. Mail Policy

The Eighth Circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005). Because Plaintiffs have failed to show that the actions of any of the County Defendants amounted to a constitutional violation, the Court finds that County Defendants are entitled to summary judgment on any *Monell* claim related to the improper handling of Plaintiffs' legal mail and Hari's discovery materials.

Plaintiffs have also failed to establish, outside of the specific instances alleged against the named County Defendants, that the mail policy or ACJ staff's handling of their mail established a custom that resulted in violation of their constitutional rights. A number of policies discuss the importance of inmates being allowed to communicate privately with their legal counsel, the court, and other entities via confidential mail. (*See, e.g.*, ECF No. 362-12 at 2; ECF No. 362-5 at 2.) When Hari's non-confidential mail was being scanned, ACJ staff were repeatedly reminded not to scan her legal mail. (ECF No. 362-14 at 1-2, 4.) The record before the Court indicates that in certain instances Hari's legal mail may have been scanned to Lieutenant Larson;[18] Lieutenant Larson, however, in conjunction with policy, reminded ACJ staff that they should never scan legal mail, and quickly deleted

---

[18] The record does not establish with any specificity exactly when or how many times this happened, only that on June 6, 2019, Lieutenant Larson sent an email telling ACJ staff that she had been receiving scans of Hari's legal mail and reminding them that she should never get legal mail in scans. (*See* ECF No. 376 at 3.)

those scans.  (ECF No. 376 at 3.)  Furthermore, the record is devoid of evidence that these scans were in fact of legal mail.  *See Moore*, 354 F. Supp. 2d at 1078 ("The question of whether a particular piece of correspondence is 'legal mail' is a question of law.").  Neither party has produced these scans, and the record establishes that scans drop off the ACJ server within 90 days.  *See* ECF No. 374-1 at 37-38.

Nor does the scanning of Hari's mail envelopes, including legal mail envelopes, amount to a violation. At the time, Hari was in disciplinary segregation for tampering with an electrical outlet in her cell and was an escape risk.  *See Hari I*, 2020 WL 7249816, at *3, 8.  The ACJ had clear concerns regarding her behavior, particularly in light of the criminal charges she was currently facing.  *See id.* at *8.  However, though officials acted by adopting a custom to scan the envelopes of Hari's legal mail, the record before the Court demonstrates there was never a persistent and widespread custom of scanning her confidential legal mail.

Further, as discussed above, any specific act of County Defendants scanning documents Hari claimed were legal mail did not result in actual injury to Hari, which warrants summary judgment on these claims.  *Cf. Thomsen*, 368 F. Supp. 2d at 975 ("Plaintiff's *Monell* claim against Crow Wing County fails, first, for failure to demonstrate a constitutional injury . . . and second, for failure to show a wrongful governmental policy or custom.")  (internal citation omitted).  Nor does this record establish a pattern or practice necessary to establish a violation of Plaintiffs' free speech rights under the First Amendment.  *See Blair-Hanson*, 2020 WL 5105775, at *4.

44

**b. Phone Policy, Law Library Policy, and Computer Access**

The Court also recommends granting County Defendants' motion for summary judgment on Plaintiffs' claims against the ACJ's  telephone and law library policies because Plaintiffs have failed to show how the ACJ policies have deprived them of  their rights.  The phone policy clearly outlines how an inmate may make a request to have their attorney's number added to the system so that any calls to that number are not monitored. (ECF No. 362-15 at 1; *see also* ECF No. 362-11 at 13.)  Any inadequate implementation of this policy and monitoring system (to the extent it is alleged by Plaintiffs) would not arise to the level of a *Monell* violation by County Defendants.  *See Andersen*, 2009 WL 3164769, at *8.

That Hari was unable to schedule calls with her attorneys at specific times and that the phone abutted the control room does not mean that Plaintiffs had improper access to a phone with which they could contact their attorneys privately.  On this record, there is little to no evidence that ACJ officials in the control room were listening to Plaintiffs' privileged calls.  Hari does claim that a Deputy Rosier overheard her talking on the phone and "telling someone for my lawyers to get down here . . ."  (ECF No. 371 at 11.)  The entirety of that log entry, dated May 30, 2019, reads, "[t]elling someone for his lawyers to get down here to talk to [her] because there is 'some seriously weird stuff going on' referring to the cell searches.'"  (ECF No. 362-19 at 8.)  It does not mention that Hari was on the phone when she made this comment.  Nor does it mention Rosier's location when this comment was overheard.  And, in any event, phone access is but one way Plaintiffs could have accessed the courts.  *See Beaulieu*, 690 F.3d at 1039 (finding that while inmates have a right of

access to the courts, they "do not have a right to any particular means of access, including unlimited telephone use.") (quoting *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992)).

It is also undisputed that during this time period Plaintiffs did not have access to a computer. However, the record before the Court clearly demonstrates that Plaintiffs had access to sufficient legal resources within the law library and through the ability to contact their attorneys via phone, mail, and in-person visits, and thus the lack of computer did not infringe upon Plaintiffs' right to access the courts. *See Reese v. Sherburne Cty. Det. Ctr.*, No. 19-cv-1975 (ECT/KMM), 2021 WL 4896996, at *4 ("While [Plaintiff] may prefer to use the computer, he is not constitutionally guaranteed that privilege when alternative means of access to the courts exist and are sufficient.") (citing *Bounds v. Smith*, 430 U.S. 817, 830 (1977)). Nor does the lack of a specific legal resource in the law library mean that the ACJ's policy or materials were insufficient. *See Lewis*, 518 U.S. at 351 ("In other words, prison law libraries . . . are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'") (quoting *Bounds*, 430 U.S. at 824).

In any event, Plaintiffs have not shown that either the phone or law library policy, or the lack of a computer, prejudiced their efforts to access the courts or pursue a legal claim. *See Sabers*, 100 F.3d 82, 84 (8th Cir. 1996) ("[A] plaintiff cannot merely allege a denial of access to a law library or adequate attorney, even if the denial is systemic. Instead, the plaintiff must show the lack of a library or the attorney's inadequacies hindered the plaintiff's efforts to proceed with a legal claim in a criminal appeal, postconviction matter, or civil rights action seeking to vindicate basic constitutional rights.") (citations omitted);

*Dale v. Brott*, No. 12-cv-383 (PJS/JSM), 2013 WL 12074952, at *9 (D. Minn. July 23, 2013) ("To maintain an access to the courts claim, an inmate must identify some *specific injury* resulting from an allegedly lost opportunity to litigate effectively.  Alleged injuries that are merely speculative—*i.e.*, injuries that *might* have been avoidable—are not sufficient.") (citation omitted), *report and recommendation adopted*, 2013 WL 12074953 (D. Minn. Sept. 5, 2013), *aff'd*, 562 F. App'x 551 (8th Cir. June 24, 2014) .  Plaintiffs here have not presented any specific injury they experienced due to lack of a computer, lack of specific resources in the library, or the ACJ phone policy.  And, any separate analysis under the Sixth Amendment shows that the record demonstrates that Plaintiffs were not prejudiced due to these policies.  *See Thomsen*, 368 F. Supp. 2d at 974.  County Defendants are thus entitled to summary judgment on these claims.

### 4.  1st Amendment Retaliation Claims

Laughlin claims that he was subject to retaliation for filing grievances and this lawsuit when he was placed in "a wet cell in booking for hours instead of [being moved to] a regular housing unit," as well as by being threatened, intimidated, and scolded.  (Sec. Am. Compl. ¶  37.)  The Court first notes that in his response to County Defendants' interrogatories, Laughlin states his belief that this claim is being withdrawn by Plaintiffs. (*See* ECF No. 345 at 1 (answering "[n]ot important, we are dropping these claims" three times).)  Then, only after County Defendants moved for summary judgment, did Laughlin file a detailed declaration, which is in Hari's handwriting and signed by Laughlin.  (*See* ECF No. 384.)

Hari has been reminded by this Court that she cannot litigate the other Plaintiffs'

claims on their behalf, and all Plaintiffs have been informed that it is incumbent upon them to litigate their own claims. (ECF No. 342 at 6-7.) The record as a whole, in addition to the contents of this declaration, suggests it is Hari's work product, and the Court highly doubts that Laughlin would have produced such a document, or such testimony, without Hari's prompting. The Court again warns Hari that she may not practice law on behalf of Laughlin, and Laughlin is reminded that he must litigate his own claims. *See, e.g.*, 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead or conduct their own cases personally or by counsel.").

Laughlin's declaration does not foreclose summary judgment on this issue. "A party cannot avoid summary judgment by contradicting his own earlier testimony." *Thomsen*, 368 F. Supp. 2d at 972 (citing *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983)). Laughlin clearly believed these claims were being dropped and filed no substantive responses to County Defendants' requests for discovery to support his claims.

Second, County Defendants were never provided further details on this claim in the pleadings. The Court allowed Laughlin to add a retaliation claim when it allowed Plaintiffs to file their First Amended Complaint. (ECF No. 81.) When Plaintiffs filed their First Amended Complaint, they stated that "Laughlin brings a 1st Amendment retaliation claim against SGT Wood and DD Evans . . . based on events described in paragraph 40." (ECF No. 85 ¶ 1.) There is, however, no paragraph 40 in the First Amended Complaint. (*See generally id.*) Also, neither the First nor operative Second Amended Complaint expounds on Laughlin's blanket statement that he was subject to retaliation by ACJ staff by being

placed in a wet cell for filing grievances and this lawsuit. (*See generally* ECF No 85; Sec. Am. Compl.) It is only in the summary judgment briefing and Laughlin's declaration that this claim is explained.

County Defendants should also prevail on the merits. To establish an unlawful retaliation claim, Laughlin must demonstrate that (1) he engaged in protected activity; (2) County Defendants adversely responded in a way that would "chill a person of ordinary firmness;" and (3) the adverse action was motivated by the protected activity. *L.L. Nelson Enters., Inc. v. Cty. of St. Louis, Mo.*, 673 F.3d 799, 807-08 (8th Cir. 2012) (citation omitted). In assessing the third prong, the Court must consider whether but for the retaliatory motive, Defendants would have engaged in the retaliatory conduct. *Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 2009). The record before the Court does not demonstrate that there is a triable issue of fact beyond a self-serving declaration purportedly authored by Laughlin. *See Turner*, 784 F.3d at 489. The balance of the record also shows that Laughlin was housed in Unit 4 until his release in August 2019 because he had assaulted deputy sheriffs in the ACJ. Therefore, County Defendants are entitled to summary judgment on Laughlin's retaliation claim.

## 5. Request for Injunctive Relief

Plaintiffs seek injunctive relief against Defendants in their official capacities. (Sec. Am. Compl. ¶ 7; p. 13.) Once an inmate has been transferred, however, injunctive relief claims that relate to the conditions of confinement are moot. *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012); *see also Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) ("a prisoner's claim for injunctive relief to improve prison conditions is moot if he or she

is no longer subject to those conditions.").  Neither Laughlin nor Hari is still housed in the ACJ.

Plaintiffs argue that they are still subject to these "conditions" because Defendants continue to possess and disseminate privileged legal materials that they seized while Plaintiffs were inmates in the ACJ.  (ECF No. 371 at 26-28.)  Plaintiffs, however, have not identified concrete instances establishing that County Defendants have continued to improperly disseminate their legal mail.  As best as this Court can tell, the "legal materials" or legal mail of which Hari speaks have largely been shared in connection with other litigation she herself brought at issue, *see Hari v. Smith et al*, No. 20-cv-1455 (ECT/TNL) (D. Minn.).  The Court has also found that County Defendants are entitled to summary judgment on all of Plaintiffs' claims against County Defendants.  Therefore, the Court recommends denying Plaintiffs' request for injunctive relief.

### E.  Conclusion

Based on the evidence before the Court, no jury could reasonably conclude that any of the County Defendants violated Plaintiffs' federal constitutional rights as alleged in the Second Amended Complaint, and thus County Defendants are entitled to summary judgment as a matter of law.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Torgerson*, 643 F.3d at 1042-43.  The Court therefore recommends that County Defendant's motion for summary judgment be granted, and that the claims against County Defendants be dismissed with prejudice.

## III. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. County Defendants' Motion for Summary Judgment (ECF No. 357) be **GRANTED**.

2. The claims asserted by Plaintiffs Laughlin and Hari against County Defendants be **DISMISSED WITH PREJUDICE**.


Date: January __21__, 2022            _____*s/Tony N. Leung*_____
                                      Tony N. Leung
                                      United States Magistrate Judge
                                      District of Minnesota

                                      *Laughlin, et al. v. Stuart, et al.*
                                      Case No. 19-cv-2547 (ECT/TNL)


### NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).